Dukeee, Judge,
delivered the opinion of the court:
This action arises out of the plaintiff’s claim that the leases on several parcels of land owned by her were breached when the defendant failed to return them in their original condition, as provided in the leases. The petition was filed on June 30, 1954.
At various dates during 1942 and 1943 the defendant leased five different tracts of land near Farmingdale on Long Island, New York, from the plaintiff for military purposes and for nominal rentals. The total area of all of the parcels is about 110 acres. The parcels are part of larger holdings of the plaintiff in the vicinity of the Republic Aviation flying field, the facilities of which the defendant desired to expand for wartime use. The parcels referred to as numbers 1, 4 and 5 are contiguous. Parcels 2 and 3 are contiguous and are connected to the others by a right-of-way over other lands belonging to the plaintiff. The lands were cleared and level at the time the leases were executed. They were not then being put to any use and, although they had been farmed at one time in the past, they were zoned residential.
Beginning around 1928 and continuing to the present time, the area surrounding plaintiff’s holdings has undergone business and industrial expansion so that today her lands are entirely surrounded by properties devoted to such use. These holdings constitute an extremely desirable industrial site since there is no other single piece of available land of this size within thirty miles of New York City.
The leases were executed by a representative of the Army Corps of Engineers on behalf of the defendant. The pertinent portions of the leases are more fully set forth in our findings, but, briefly, each of the five leases contained the following provisions: no assignment or subletting of the lease and no use of the premises by anyone other than the Government; optional renewal of the lease from year to year provided the plaintiff be given at least sixty days notice; prior to the final termination of the lease, restoration of the land by the Government to its original condition, which restoration was to include the removal of structures, roads, road beds, and all other materials and debris and the *504 replacing of topsoil on the premises which was then to be graded and leveled. In addition, the leases covering parcels 1, 4 and 5 provided that no trees were to be cut down or removed without written permission from the plaintiff. Leases 1, 2 and 3 also provided that rentals would continue to accrue until the restoration of the particular parcel had been completed. The annual rentals varied from $375 on the third lease to $1,311 on the first lease.
Pursuant to the leases, the defendant entered upon the lands and began to place certain improvements, designed to accomplish the desired military purposes, thereon. On the first parcel about 60 buildings were erected, all of which had either concrete slab floors or concrete footings and foundations. The defendant also constructed the usual subterranean installations, such as cesspools, septic tanks, water and sewerage pipes, etc., and macadam roads and cinder paths. Parcels 4 and 5 were devoted to a winterized encampment for the personnel assigned to the base. The defendant installed concrete slabs, gravel roads, water and sewerage pipes, cesspools, septic tanks, grease traps, sewers and drains on these parcels. More than four of the 15.6 acres comprising parcels 2 and 3 were covered with concrete aprons and slabs which constituted an extension of the runways of the adjacent airfield. In addition, some 11 buildings together with their foundations and subsurface appurtenances were placed on these two parcels.
The plaintiff contends that the Government has breached its lease covenants in that it has failed to or refused to restore the five parcels to their original condition. The defendant has asserted that suit as to the obligations arising out of the first parcel was not instituted within six years of the date on which the cause of action first accrued. Although the Government admits its unjustifiable failure to restore parcels 2 and 3 in accordance with the leases, there is a serious contest between the parties as to what is the proper cost of accomplishing the restoration. Involved in this controversy is the question of the date on which the breach was consummated. Finally, it is the contention of the defendant, and the trial commissioner has so found, that parcels 4 and 5 have been restored to their original condition thereby dis *505 charging any further duty of this nature toward the plaintiff.
We must inquire, therefore, into these problems: whether or not the cause of action on parcel 1 accrued prior to June 30, 194:8; at what point did the defendant breach its agreement to restore and what was the cost of accomplishing restoration as of that date; and whether, in fact, parcels 4 and 5 have been restored to their original state. There are rents due and unpaid on all five parcels; the exact amounts will depend upon our decisions on the foregoing questions. Finally, claim is made by the plaintiff for the value of 20 trees allegedly cut down and removed from parcel 1 without the plaintiff’s permission.
After the conclusion of hostilities in 1945, it was determined that the Veterans Administration could mate use of some of the improvements which had been placed on parcel 1. The entire responsibility for the lease on this tract was transferred by the Corps of Engineers to the VA effective January 1,1946. The agreement accomplishing this gave the VA “administrative authority over, and responsibility for” the first lease. The VA was to assume all the terms, obligations, and conditions of the lease including the obligations of rent and restoration. No copy of this transfer was furnished to the plaintiff nor was she given notice of it at this time. After removing certain of the improvements, the VA attempted unsuccessfully to contact the plaintiff concerning the obligation to restore the property. No conferences on this subject were ever held between plaintiff and the VA.
The Veterans Administration notified the plaintiff that it desired to discuss the termination of the lease on parcel 1 in April 1947. Receiving no reply, the VA purported to terminate the lease effective July 19,1947. Before this time the VA had removed all of the above surface improvements, except a chapel building, a garage, and three standing chimneys, leaving all of the foundations, roadways, and subterranean installations on the land.
The plaintiff subsequently submitted rental bills covering the first parcel to the VA which rejected them insisting that the lease had been terminated. No rent under the first lease was paid by the defendant for any period beyond June 30, *506 1947. Plaintiff contacted the Corps of Engineers at various times thereafter regarding both the payment of rents and the obligation to restore the property to its original condition but that agency declined to give the plaintiff any satisfaction on the ground that administrative jurisdiction over parcel 1 had been transferred to the Veterans Administration. In December 1948 a meeting was arranged between the plaintiff and the Corps of Engineers to discuss the future of parcels 2 through 5. At this meeting the plaintiff raised the question of parcel 1 and signified her belief that the transfer of responsibility to the VA was in violation of the lease. The defendant’s representative at that meeting again expressed the belief that the Corps of Engineers no longer had jurisdiction over this parcel and suggested that the plaintiff discuss the problem of parcel 1 with the VA.
Again, at various times following the December 1948 meeting, plaintiff attempted to collect rents on the first lease from the Corps of Engineers. Finally, in 1953, the plaintiff referred her complaints concerning all five leases to the Secretary of Defense, and suit in this court was instituted the following year.
The defendant’s position is that the cause of action as to the first lease arose either on June 30, 1947, when the VA failed to give sixty days notice of renewal or on July 19, 1947, when the notice of cancellation became effective. It does not deny that restoration of this parcel has not been accomplished. The plaintiff, of course, contends that the claim arose within the six years prior to the date of her petition, June 30, 1954. In our judgment, the petition is timely with respect to the claims on all of the parcels.
In a case in which claim was made for the breach of a covenant to restore, similar to the ones now before us, the defendant having permitted unexploded artillery shells to remain buried on the premises after the termination of the lease, this court said, “the plaintiffs’ claims did not accrue until the condition of the plaintiffs’ land became known, and the defendant thereafter either failed to restore the land within a reasonable period of time or expressed a relatively final judgment that the land could not be restored.” *507 Spitzel v. United States, 146 Ct. Cl. 399, 403. We think that the same principle applies in this case. Notwithstanding the purported termination of the first lease by the YA in 1947, the plaintiff had the right to reasonably expect that the land would be restored to its original condition within a reasonable time. The fact that the YA denied its obligation to pay rents beyond June 1947 need not necessarily have indicated that the Government was repudiating its agreement to restore parcel 1 to its original condition. At no time did the YA unequivocally state that it would not restore the property. And as late as the end of 1948 the Corps of Engineers had never indicated its belief that the Government would not restore the property to its original state.
Without deciding what was a reasonable period of time in which to have expected the defendant to make restoration of the land, we note that negotiations between the parties as to the restoration of the other leases continued throughout all of 1948. Furthermore, it was not until the meeting between the plaintiff and representatives of the Corps of Engineers in December 1948 that the plaintiff was furnished with engineering drawings from which she could determine the conditions which then prevailed on each of her five tracts of real estate.
Measuring the present factual situation against the yardstick utilized in the Spitzel case it is apparent that the cause of action as to the first parcel had not matured to a point which could set the period of statutory limitation in motion prior to June 30,1948'. The precise date on which the breach of the covenant to restore parcel 1 occurred and from which date the costs of restoration constituting the damages are to be computed, will be stated in our discussion of parcels 2 and 3.
On those parcels reposed improvements which the Government considered to be valuable. It believed that the base would become surplus shortly after the termination of hostilities and, in the event that the improvements could not be utilized by some department of the Government, it was the defendant’s practice to return leased premises without removing the improvements. If the improvements were us *508 able by the landowner the Government would take full credit for them against a cash settlement for the costs of restoring the land. If the improvements could not be used by the landowner the Government would take credit for their salvage value against a cash settlement for restoration costs. Only if some such agreement could not be reached with the lessor would the defendant actually demolish the improvements and effect physical restoration of the premises.
The leases on parcels 2 and 3 were renewed successively through June 30, 1948, but not beyond that date. Previously, as early as October 1945, conferences had been held between the parties devoted to discussions of the return and restoration of the tracts. Plaintiff had initially been advised that when and if the leases were cancelled negotiations would be undertaken “concerning the disposition of improvements made in fulfillment of the restoration obligation.” Many months after plaintiff had received this advice she was notified that she would be informed when the Corps of Engineers had completed its estimate of the cost of removing the improvements on parcels 2 and 3 and of restoring the premises. The defendant was unable at first to arrange a meeting with the plaintiff when the restoration surveys were completed but it did give her notice. When a meeting was arranged the plaintiff expressed reluctance to allow the defendant any credit for the value of the improvements on tracts 2 and 3. The defendant on the other hand, urged plaintiff to consider the possibility of leasing the land to a private helicopter concern which might be able to make use of the lands as improved. At this point, in December 1947, the matter was left open. At about this time the plaintiff was furnished with a set of “as-built” drawings of-the hangars on the two parcels.
No leasing of the premises to any private business concern was undertaken and, during the ensuing months, much of the equipment in the buildings on parcels 2 and 3 was removed. In December 1948, the parties again met to discuss the future of the lands covered by the second and third leases. They did not exchange estimates on the cost of restoration but the defendant’s representatives informed plaintiff verbally of the figure at which they had arrived. The plaintiff demanded *509 either a cash payment covering the cost of restoration or restoration prior to return of the parcels by the defendant in strict accordance with the leases. The defendant’s representatives expressed the belief that a restoration of that sort would involve economic waste in view of the plaintiff’s known desire to use the entire area for an industrial park. They also believed that restoration costs might exceed the value of the land. At this meeting additional drawings which revealed the location of the subsurface installations remaining on the land were turned over to the plaintiff.
No agreement was arrived at during the ensuing months and the defendant had the above surface improvements removed. Then, in February 1950 the Corps of Engineers contacted plaintiff informing her that the premises under the second and third leases were being returned to her and that the defendant did not believe it was legally required to expend any amount on restoration greater than the market value of the premises diminished by the presence of the Government-placed fixtures. In other words, it expressed the belief that the restoration costs exceeded the fair market value and it did not intend to incur such costs. The defendant offered to make a cash settlement and to pay the overdue rent charges.
As stated above, the plaintiff took up her problems concerning these leases with the Secretary of Defense in 1953 and filed suit here the following year.
The experts who appeared for both sides at the trial of this case have interpolated the costs of restoration through all of the years in which the right to damages may have accrued. In plaintiff’s opinion, the right to damages accrued in 1953 when her administrative claim for relief was denied by the Defense Department. We think that that theory places the breach later than it actually occurred.
Although the defendant ceased paying rent in June 1948, it had attempted to work out some satisfactory manner of solving the restoration problem with the plaintiff on several occasions before and after that date. Moreover, at the meeting in December 1948, she was given engineering drawings which enabled her for the first time to determine the full extent of the debris still remaining on her land. And even *510 after tbat meeting there was still no definite indication that the defendant would choose not to perform the restoration.
A reasonable time had not necessarily elapsed in which the defendant should have accomplished the restoration by February 8, 1950, 14 months after the December 1948 meeting, in view of the complexity of the problems involved. But the notice given the plaintiff was sufficient to inform her at that time that the defendant had determined not to complete the work required by the lease, and that further negotiations between the parties would be pointless. Under the holding of the Spitsel case, the accrual of the right to damages dates from that point. The defendant has admitted in its answer that it owes rents up to that date inferring that in its view the damages were fixed on that date. Although the factual setting is somewhat different with respect to the first leased property, we believe that the right of action thereto also accrued on February 8, 1950. Plaintiff had reason to suppose that the position of the Corps of Engineers would be shared by the YA in their handling of parcel 1. It was only by virtue of the drawings given her in December 1948 that she could have determined the extent of the work to be done on parcel 1 and, as mentioned above, the YA had not indicated its unwillingness to try to come to some satisfactory agreement on the restoration of that tract. Furthermore, it would have been economically unsound for plaintiff herself to have begun piecemeal restoration of the leased lands while the situation was still in doubt as to parcels 2 and 3.
The trial commissioner has made findings as to the costs of demolition and restoration for each of the first three parcels for each of the years 1941 through 1954.[1]
Notwithstanding vigorous exception to these findings by the plaintiff on the ground that she has fully sustained the burden of proving the restoration costs while the defendant has not, a thorough review of the documentary and testamentary evidence convinces us that the commissioner’s findings on this point are amply supported by the record and we therefore adopt those cost figures as our own.
*511 During its negotiations with the plaintiff, the Corps of Engineers representatives indicated a belief that there was a legal ceiling on the amount that the Government could be required to pay in restoration costs measured by the fair market value of the property. Whether as a matter of law this is correct is a question which need not be decided since the cost of restoring the premises does not begin to approach its market value. The fair market value of plaintiff’s lands, as found by the trial commissioner, was $10,000 per acre in 1950 for industrial and commercial purposes, which is the use to which the plaintiff intends to put her realty. This finding looks to the realities of the situation because, although the land is now zoned residential, the local zoning regulations will permit the plaintiff to have it rezoned industrial virtually on her own application.
That portion of the award representing restoration costs for tract 1 must be based on the acreage as it existed in 1942 and in 1950 since that is the acreage to which the original restoration covenant which was breached in 1950 related. Finally, we reject the defendant’s suggestion that the plaintiff is entitled to only half of the restoration costs for tract 1 since she owned only an undivided one-half interest in that tract until May 1950 when she acquired the remaining one-half interest. The lease was entered into between the plaintiff and the Government and consequently the obligations which it set up ran from the Government to her and to no one else. Any obligation which the plaintiff may have to her previous co-owner plays no part in the consideration of this lawsuit.
The defendant’s position with respect to the lands covered by leases 4 and 5 is that restoration to the original condition had been effected by the date on which the leases were cancelled, July 19, 1948. The defendant had performed certain restoration work on these lands and purported to cancel the leases early in 1947. The plaintiff complained, however, that the work was not satisfactory and as a result of these objections the leases were reinstated and the Government re-entered and performed additional work in April and May 1948. The operations performed on these premises included the removal of concrete slabs, the removal of cess *512 pools, septic tanks and roadways, backfilling, the replacing of topsoil and reseeding. The evidence fully supports the conclusion that these two parcels were returned to the plaintiff satisfactorily restored to their original condition. The defendant has admitted its liability for rents on both tracts for the period between June 30, 1948 and July 19, 1948. Those amounts are $20.73 and $40.55, respectively.
There are rents admittedly due on the other three parcels, too. Since tracts 4 and 5 were returned in a restored condition only those amounts referred to above for the 19 days in July 1948 are properly due. No rents have been paid under the second and third leases for any period beyond J une 30, 1948 or under the first lease since J une 30,1947. As we have indicated earlier the plaintiff knew of the obduracy of the defendant in the matter of restoration no later than February 8, 1950, and thereafter she was free to enter upon the premises and take such action as she saw fit in the circumstances. She does not urge that rents are due beyond the date when her right to damages became fixed. Consequently, prorating the annual rentals on parcels 1, 2 and 3 through February 8, 1950, she becomes entitled to $3,415.88, $722.50, and $602.08 on each of those tracts respectively.
Finally, there is the matter of the twenty trees removed from parcel 1 by the defendant without plaintiff’s permission in violation of the lease. The defendant’s contention that these trees were on a public thoroughfare rather than on plaintiff’s land is not substantiated by the record. The felled trees were native oaks and maples varying from 9 to 26 inches in diameter. The evidence is that the cost of replacing such mature trees would average approximately $1,000 but that $100 is the average maximum paid for such trees by the Department of Public Works of the State of New York when they are removed in connection with road widening and the like. In view of the fact that the plaintiff plans to use this property for industrial rather than residential use, we conclude that $500 for each of the 20 trees is adequate compensation for their improper removal.
Accordingly, the plaintiff is entitled to recover $159,774 as the 1950 restoration costs of parcels 1, 2 and 3, $4,801.74 as accrued rents on all five parcels, and $10,000 as replace *513 ment cost of the trees improperly removed. Judgment will be entered for her in the total amount of $174,575.74.
It is so ordered.
Reed, Justice {Bet.), sitting by designation; Laramore, Judge, Madden, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul R. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. This action was filed to recover (1) the cost of restoration of certain properties leased by plaintiff to defendant, and (2) rents alleged to be due to plaintiff under the leases. Plaintiff’s action is set forth as five individual claims, each based on a separate lease entered into between plaintiff and defendant.
2. In 1942, prior to the execution of the leases referred to, plaintiff was the full or partial owner of approximately 300 acres of land near Farmingdaie, Long Island, and which were in the township of Babylon, Suffolk County, New York. The land had formerly been cultivated farm land. It was cleared, leveled and graded, with an apple orchard and numerous other trees thereon. However, the property had not been used for farming purposes for many years, having remained idle. No buildings were on the property. Plaintiff received no income from the apple crop.
3. By five leases dated as of various dates in 1942 and 1943, plaintiff leased to defendant five parcels of land, comprising 110.4 of the 300 acres above mentioned. The leases were duly executed as of the following dates and are identified as follows:
(a) Contract No. W-1098-Eng.-3355, dated January 26, 1942, covering 58.8 acres (hereinafter called the first lease);
(b) Contract No. W-1098-Eng.-2505, dated August 27, 1942, covering 8.89 acres (hereinafter called the second lease);
(c) Contract No. W-1098-Eng.-3231, dated October 1, 1942, and Supplement No. 1 thereto dated June 22, 1943, *514 covering 6.707 acres (liereinafter collectively called the third lease);
(d) Contract No. W-30-082-Eng.-6798, dated August 17, 1943, covering 18.203 acres (hereinafter called the fourth lease) ; and
(e) Contract No. W-30-082-Eng.-6801, dated August 17, 1943, covering 17.8 acres (hereinafter called the fifth lease).
All of the leases were executed on behalf of defendant by a contracting officer in the Corps of Engineers, United States Army, located in the office of the Division Engineer, North Atlantic Division, New York City. Plaintiff also resided in New York City. The parcels of land covered by the five leases have been referred to by the parties as parcels 1, 2, 3, 4 and 5, respectively, and will also be so referred to in these findings.
Parcels 1, 4 and 5 were contiguous. Parcels 2 and 3 were also contiguous. They were separated from 1, 4 and 5, but were accessible to them by a 960-foot right-of-way.
4. The area surrounding plaintiff’s 300 acres, of which the leased premises are a part, has undergone an industrial expansion which began as far back as 1928, until today it is entirely surrounded by industries and businesses. At present, there is a heavy concentration of industry to the north, south and east of plaintiff’s property and of business to the west of the premises. The southern portion of plaintiff’s property is bisected by the Montauk division of the Long Island Eailroad and another branch of the railroad is located near the northern border. In addition, the property is bisected by two heavily traveled highways.
5. An airfield of the Eepublic Aviation Company was located north of the leased premises, and adjoining parcels 2 and 3. In 1940, this airfield, called the Farmingdale Air Field, was enlarged for defense purposes, and later, in connection with such enlargement, it became necessary to provide facilities for Army personnel and for other military purposes related to the airfield operation. It was for this purpose that defendant leased plaintiff’s properties.
6. Of the five parcels comprising the 110.4 acres, plaintiff owned an undivided one-half interest in parcel 1, the 58.8 acres, and in parcel 4, the 18.203 acres, until May 9,1950, *515 at which time she acquired the outstanding undivided one-half interests in such acreage. However, at all times pertinent herein, plaintiff owned in fee simple parcels 2, 3, and 5.
7. The first lease covering parcel 1 provided that the property was “to be used exclusively for”:
Farmingdale Dispersion Point; Administration Bldg., Officers and Enlisted Men Quarters; Arms and Supply Warehouses, Mess Bldgs., Infirmary Bldgs., Badio Bldg., Lavatories, and roads * * *.
It further provided in pertinent part:
4. The Government shall not assign this lease in any event, and shall not sublet the demised premises, and will not permit the use of said premises by anyone other than the Government. Land to be used for the purpose stated in paragraph No. 2 only.
5. This lease may, at the option of the Government, be renewed from year to year at a rental of One thousand, three hundred and eleven ($1,311.00) Dollars per annum, and otherwise upon the terms and conditions herein specified, provided notice be given in writing to the Lessor at least sixty (60) days before this lease or any renewral thereof would otherwise expire: Provided that no renewal thereof shall extend the period of occupancy of the premises beyond Six (6) months after the termination of World War II.
6. The property covered by this lease is cleared, leveled, graded and formerly cultivated farm land with the exception of a portion at the northerly end which is an apple orchard surrounded by evergreen trees approximately 50. ft. to 60. ft. high.
6a. This lease or any renewal thereof may be terminated by either party on sixty (60) day’s [sic] written notice, one to the other.
‡ * % iH
7. The Government shall pay the Lessor for the premises rent at the following rate: One thousand, three hundred and eleven ($1,311.00) Dollars per annum for her undivided one-half interest. Bent payment to continue until such time that the property has been restored to it’s [sic] original condition. Payment shall be made semi-annually on June 30th and December 31st of each year.
8. The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures, or signs, in or *516 upon the premises hereby leased, which fixtures, additions, or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and will be removed therefrom by the Government prior to the termination of this lease, and the Government will before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, including acts or sabotage and acts by the public enemy, excepted.
% ifc íJí }{i s}:
12. No trees are to be removed or cut down from the leased premises unless by written permission of the Lessor.
13. Before the termination of this lease or the termination of the final renewal thereof, the Government agrees to restore the property to it’s [sic] original condition. Restoration to include the removal of all structures, foundations, roads, road beds and all other materials and debris from the premises. Areas where top soil has been removed or disturbed must be restored and new top soil deposited, graded and leveled.
8. The second lease covering parcel 2 provided that the property was “to be used exclusively for * * * Military Barracks.” The other pertinent provisions thereof, including the restoration provisions, were identical with the first lease, except (1) there were no comparable paragraphs 6 (concerning the apple orchard) and 12 (concerning the removal of trees), and (2) the rent was specified as $450 per annum.
9. The third lease covering parcel 3 provided that the property was “to be used exclusively for * * * Military Purposes.” The other pertinent provisions thereof were identical with the second lease except that the rent was specified as $350 per annum up to May 10, 1946, and thereafter as $375.
10. The fourth lease covering parcel 4 provided that the property was to be used for “Military purposes.” It further provided in pertinent part:
3. to have AND to hold the said premises for the term beginning August 17,1943 through June 30, 1944, provided that, unless and until the Government shall *517 give notice of termination in accordance with provision 6 hereof this lease shall remain in force thereafter from year to year without further notice; * * * and provided further that this lease shall in no event extend beyond six months after the date of termination of the unlimited National Emergency as declared by the President of the United States in Proclamation No. 2487 dated May 27,1941.
4. The Government shall pay the Lessor rent a,t the following rate: four huNdred five dollars and ninety-two GENTS ($405.92) per annum. Payment shall be made at the end of each half of the Government fiscal year; i.e. December 31 and June 30 * * *.
5. The Government shall have the right, during the existence of this lease, to attach fixtures, and erect structures or signs, in or upon the premises hereby leased, which fixtures and structures, or signs, so placed in, upon or attached to the said premises shall be and remain the property of the Government and may be removed or otherwise disposed of by the Government.
6. The Government may terminate this lease at any time by giving sixty (60) days notice in writing to the Lessor, and no rental shall accrue after the effective date of termination.
% ifc sfi # :j«
10. The Lessor may terminate this lease at any time by giving sixty (60) days notice in writing to the Government and no rental shall accrue after the effective date of termination.
11. The Government, if required by the lessor shall, before the expiration of this lease or renewal thereof restore the premises, including top soil and surface thereof to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control excepted. Restoration to include the removal of 'all structures, foundations, roads, road beds and all other materials and debris from the premises. Areas where top soil has been removed or disturbed must be restored and new top soil deposited, graded and leveled.
12. The property covered by this lease is cleared, leveled, graded and formerly cultivated farm land divided into two fields. On the easterly, northerly and southerly borders there are a number of large maple, elm and oak trees.
*518 14. No trees are to be removed or cut down from the leased premises unless by written permission of the Lessor.
11. The fifth lease covering parcel 5 similarly provided that the property was to be used for “Military purposes.” Paragraphs 3, 4, 5 and 6 were identical to the comparable paragraphs in the fourth lease except that the rent specified was $793.88 per annum. The other pertinent provisions were as follows:
10. The Government shall surrender possession of the premises upon the expiration or termination of this lease and shall, prior thereto, return the premises in as good condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted.
11. The property covered by this lease is cleared, leveled, graded and formerly cultivated farm land divided into two fields. On the interior division and easterly fence lines there are a number of large trees. The exterior boundary lines on the north, east and the southerly line are bordered by large lilac bushes, privet hedges, large maple, elm and oak trees.
12. The Lessor may terminate this lease at any time by giving sixty (60) days notice in writing to the Government, and no rental shall accrue after the effective date of termination.
í}s «í» *1*
14. No trees are to be removed or cut down from the leased premises unless by written permission of the Lessor.
15. Before the termination of this lease or the termination of the final renewal thereof, the Government agrees to restore the property to its original condition. Restoration to include the removal of all structures, foundations, roads, road beds and all other materials and debris from the premises. Areas where top soil has been removed or disturbed must be restored and new top soil deposited, graded and leveled.
12. Defendant, through the War Department, took physical possession of the leased premises on or about the dates recited in each of the five leases and proceeded to construct extensive installations in connection with its wartime activ *519 ities in conjunction with the Farmingdale Air Field. Defendant continued in occupancy throughout the period of actual hostilities during World War II and for some period of time thereafter.
13. Defendant erected on parcel 1 a total of over 60 buildings, including barracks and a chapel, of which approximately 50 percent had concrete floors, running foundation walls and footings and approximately 50 percent had isolated or pier footings. In addition, defendant constructed on the premises macadam roads, paved areas, cinder paths, underground water supply pipes, sewer and drainage pipes, cesspools, septic tanks, leaching pools, grease traps, seepage basins, catch basins, gate valves and fire hydrants. During the process of erecting these extensive installations, defendant cut down 20 trees located on such parcel without plaintiff’s permission.
14. Parcels 2 and 3 were located adjacent to the southern end of the Farmingdale Air Field. Defendant used the premises as an extension of the runways of such airfield, constructing concrete aprons and concrete slabs thereon. Over 4 acres of the approximately 15.6 acres in these two parcels were covered by concrete aprons and slabs. In addition, defendant constructed on these parcels macadam roads and cinder paths, as well as 11 buildings, consisting of two airplane hangars, 78 by 117 feet and 76 by 120 feet, respectively, two warehouses, each 20 by 100 feet, a pilot building, 20 by 52 feet, a crash station, 32 by 32 feet, an operations building, 20 by 100 feet, a crew chief building, 20 by 76 feet, an ordnance building, 20 by 20 feet, a latrine, 12 by 20 feet, and a radio building, 18 by 44 feet. The underground installations included electrical conduits, cesspools, water supply lines, sewers and drains, septic tanks, and seepage basins. In addition, there were manholes, hydrants, gate valves and dry wells.
15. Parcels 4 and 5, which were adjoining, were used as winterized encampments for defendant’s personnel at the Farmingdale Air Field. Defendant installed upon these premises concrete slabs, gravel roads, water supply pipes, cesspools, septic tanks, grease traps, sewers and drains.
*520 16. After the termination of hostilities in the fall of 1945, the Corps of Engineers felt that the installations it had placed on parcels 2 and 3 (which were adjacent to and used as an extension of the Farmingdale Air Field) would in the near future become surplus to the Government’s needs and that leases 2 and 3 covering such parcels could then be terminated. Since there were valuable installations on these parcels, especially the two airplane hangars, the Corps felt that it would be appropriate to hold a conference with plaintiff, at which defendant’s general procedures and policies in fulfilling its restoration obligations could be explained. These policies and procedures were as follows: If neither the War Department nor any other Government agency had any further use for the improvements so that they would become surplus property so far as the Government was concerned, the War Department would, in order to avoid economic waste, negotiate with the lessor to attempt to work out a satisfactory arrangement which would permit the improvements to remain in place. For this purpose, it was the Department’s practice to calculate what the cost of actual demolition and restoration to original condition, and what the salvage value of the improvements, would be. If agreement could be reached on these figures, and it would be satisfactory to the lessor to permit the improvements to remain in place, the Department would, in the normal situation, take credit for the salvage value if the lessor had no use for the improvements, or for the full value if the improvements were useful to the lessor, and pay the difference, if any, to the owner in full satisfaction of its restoration obligation. Only in the event that agreement, after such negotiations, could not be reached, would the Department demolish the improvements and actually effect physical restoration of the premises.
17. As a result of the considerations set forth in finding 16, a conference was, at the suggestion of the officials of the Corps, held with plaintiff on October 10, 1945, regarding parcels 2 and 3 at which defendant’s general policies and procedures described in finding 16 were explained. Plaintiff was assured that, if the installations were declared to be surplus property, she would be consulted before any *521 structures were removed or any restoration was commenced and that defendant would prepare a report concerning the salvage value and the total cost of restoration. Even before the five leases had been entered into, plaintiff had manifested interest in having any Government installations on the property remain. She had, by letter of January 25, 1943, offered to defendant “the free use” of the property “for the nominal sum of $1 per year rental”, in lieu of condemnation proceedings, and stated: “It will be agreeable to me if the Government, in lieu of restoration, elects to leave all the improvements on the property at the termination of the lease.” After the meeting, and in confirmation of her understanding of the War Department’s policy in handling restoration matters, plaintiff, on October 18, 1945, sent the following letter to defendant concerning the second and third leases:
On October 10th, 1945 I called at your office regarding the restoration of the property covered in the above leases and was assured * * * that no structures would be removed and no restoration started before taking up the matter with me.
During the conversation, I was given to understand that the usual procedure followed at the temiination of leases provides for a report to be made setting forth the salvage-value of the structures on the leased property, and the total cost of restoring the property under the terms of the leases. After discussing the findings with the Owner the Government either proceeds with restoring the property or makes a lump sum payment, to the Owner of an amount equal to the difference between the salvage-value and the total cost of restoration.
When you are ready to discuss these matters kindly notify me so that we may make arrangements mutually satisfactory.
By letter of November 21,1945, defendant replied as follows:
This is to acknowledge your letter of 15 November 1945 * * * concerning the above leases. As advised * * * at the time of your last visit, if and when these cases are cancelled, it is the policy of the War Department to negotiate with the owner concerning the disposition of improvements made in fulfillment of the restoration obligation.
*522 When these installations become surplus, this office will gladly discuss these matters with you which we are sure will result in arrangements mutually satisfactory.
18. In connection with a survey to determine whether any other Government agency had need for any of the improvements installed on the five parcels, and whether, therefore, they could be declared surplus and become the subject of negotiation with plaintiff, as set forth in finding 16, it was ascertained that the Veterans Administration had need for some of the improvements on parcel 1 for its Northport, Long Island, facilities. It was therefore agreed between the War Department and the VA that the entire responsibility concerning the first lease would be assumed by the VA. This agreement was effected by a letter dated April 16,1946, from the Corps of Engineers to the VA, which was accepted by the VA. Under the terms thereof, the Corps transferred to the VA, effective as of January 1, 1946, “administrative authority over, and responsibility for” the lease covering parcel 1. The letter stated that it was the understanding and agreement of the agencies “that the Veterans Administration will assume all the terms, conditions and obligations of the aforementioned lease upon the part of the Lessee to be performed, including the rental obligation, as of 1 January 1946, and restoration obligations.” No copy of this letter was sent to plaintiff, nor was plaintiff otherwise informed or consulted about this transfer at the time it was made.
19. VA thereafter proceeded to remove some of the installations on parcel 1. After it completed the removal of such installations as it desired, its officials attempted to contact plaintiff by telephone to discuss with her a basis for settlement of the restoration obligations specified in the first lease. However, they were unable to do so. Accordingly, there were never any conferences or negotiations between plaintiff and the VA officials concerning parcel 1.
20. By letter of October 21,1946, defendant advised plaintiff that defendant would conduct a survey of parcels 4 and 5 “for the purpose of determining the work necessary to restore these two parcels.” The letter stated that representatives of the Corps would be at the property on October 24, 1946, and requested plaintiff or her representatives to be present “to indicate what restoration will be required by *523 you.” Neither plaintiff nor anyone representing her was present at this survey, which did proceed on October 24.
21. By almost identical letters of December 5,1946, plaintiff notified the Corps of Engineers that she would require restoration of parcels 4 and 5 in accordance with the restoration provisions of the fourth and fifth leases. The letters stated: “An examination of the property will show the extent of the restoration required. Kindly inform me when you intend to proceed with the actual work of restoration so that I may have my representative on the ground.” By letter of December 11, 1946, the Corps replied that in the absence of plaintiff or her representative at the October 24, 1946 survey, “the site was surveyed by representatives of the Government and the items of damages to the property were noted. The Government is now correcting said items of damage.” The letter further stated that the following work was already “being performed”: “Kemoval of concrete Latrine Flooring; Leaching Pits filled up; Bemoval of septic tanks 2 feet below grade and filling in pits to ground level.”
22. On December 16,1946, defendant served upon plaintiff “Notices of Cancellation” of the fourth and fifth leases, and by letter of February 27, 1947, sent to plaintiff proposed releases pertaining to said leases, requesting their execution by plaintiff. The releases would have released defendant from all liability and claims arising out of the leases and the occupation by defendant of the parcels.
23. On April 25, 1947, the Corps sent to plaintiff notices of renewal of the second and third leases for one year, thus extending them to June 30,1948.
24. By letter of April 30, 1947, the YA advised plaintiff that defendant was “desirous of terminating” the first lease, and requested plaintiff to contact it by calling a specified individual “or by writing a letter so that an appointment may be made to meet with you and personally discuss the matter.” Plaintiff refused to comply with the VA’s request and would not contact or consult with its officials concerning the matter. Having failed to hear from plaintiff, the YA, on May 16, 1947, sent to plaintiff a “Notice of Cancellation of Lease”, which stated:
Notice is hereby given that the united states op America elects, under ¡the terms of Paragraph 6a of said *524 lease, to terminate said lease agreement and you are hereby notified of the cancellation and that said cancellation shall become effective July 19,1947.
The YA had, prior to the sending of this letter, completed the removal of such of the installations on the parcel as it desired. The installations removed consisted of all the buildings and other above-surface structures, except a concrete block building used as a chapel, a concrete block building used as a garage, and three standing chimneys. Left remaining on the parcel were foundations, roadways, concrete platforms, cesspools, leaching pits, underground pipes and other subterranean installations. Some time thereafter, the garage building burned to the ground.
25. By letter of July 9, 1947, concerning the second and third leases, plaintiff referred to her letter of October 18, 1945, and defendant’s letter of November 21, 1945 (both set forth in finding 17), and stated:
Now that the installations have been declared “surplus” I have been given to understand that an engineering report will be made setting forth the salvage-value of the installations and also the total cost of restoring the property in accordance with the terms of the contracts which include: — “the removal of all structures, foundations, roads, road beds and all other materials and debris from the premises. Areas where the top soil has been removed or disturbed must be restored and new top soil deposited, graded and leveled”.
Kindly let me know when you receive the engineering report so that we may discuss the findings and proceed in accordance with the above mentioned letters.
In reply, by letter of July 14, 1947, the Corps stated that it was awaiting its engineer’s “Estimates of cost of removal of Government improvements and restoration of subject leases” and upon receipt thereof, “contact will be made with you to attempt negotiated settlement of these cases.”
Meanwhile, plaintiff had submitted invoices dated July 1, 1947, for rental of parcels 4 and 5, but by letter of August 4, 1947, the Corps returned them with the explanation that the fourth and fifth leases covering these parcels had been canceled by its December 16, 1946 notices of cancellation (finding 22). The letter stated that: “The terms and conditions of said contracts have been fulfilled”, and requested that *525 plaintiff submit invoices on these leases for rental up to and including December 16, 1946. However, by letter of August 6, 1947, plaintiff stated that an examination of these parcels would show that they had not been restored in accordance with the provisions of the leases, and that “as the leases are still in effect the invoices are herewith returned for payment, which of course, is past due and payable.”
26. Prior to August 6, 1947, the Corps had received its engineer’s restoration cost estimates concerning parcels 2 and 3 and twice attempted to reach plaintiff by telephone to so advise her. Finally, by letter of August 6, 1947 concerning the second and third leases, the Corps requested an appointment with plaintiff “to discuss the disposition to be made of Government improvements installed on subject property as well as restoration of same.”
27. By letter of August 8,1947, the Corps referred to plaintiff’s letter of August 6,1947, concerning defendant’s alleged noncompliance with the restoration provisions of the fourth and fifth leases (finding 25), and requested that plaintiff advise “in what manner said terms and conditions have been violated.”
28. No response was made by plaintiff to defendant’s letter of August 6, 1947, concerning parcels 2 and 3 (finding 26), so further unsuccessful attempts were made by defendant to contact plaintiff. Accordingly, on August 13,1947, another letter was sent by the Corps to plaintiff advising of its inability to contact her and again suggesting that “Prior to our taking action to have these installations removed, it will be appreciated if an opportunity were afforded us to discuss the matter with you and, perhaps, work out an agreement to our mutual satisfaction.” The letter went on to state that if plaintiff did not desire to discuss the matter, “advice to that effect will be appreciated in order that the Government may proceed with the removal of these installations and the restoration of your property.” By letter of August 21, 1947, plaintiff replied that she did wish to discuss the subject of these parcels, and that she would be “pleased to make an appointment with you to take up the same.” However, the Corps’ efforts to contact plaintiff to arrange an appointment again were unsuccessful, and on September 5,1947, the Corps wrote to her suggesting September 8, 1947, “either at *526 this office or wherever you may designate” as a meeting date. Plaintiff did not meet with the Corps on September 8,1947, but instead, on September 11,1947, wrote in reply:
Some months ago I was advised that an engineering report was being completed which would show the exact cost of restoring the properties in accordance with the terms of the contracts, and the salvage-value of the structures. Kindly inform me if you now have the completed engineering report.
Upon receipt of your answer I shall communicate with you so we may arrange our appointment.
In reply, the Corps, by letter of September 17,1947, advised that it had “complete engineering data in connection with the aforementioned leases” which it would discuss at their proposed meeting.
29. Finally, a meeting was arranged in plaintiff’s office in December 1947 between two officials of the Corps and plaintiff and her engineer. Defendant’s representatives stated that the Corps wished to return parcels 2, 3, 4, and 5 to plaintiff. As to parcels 2 and 3, they stated that the Corps had not disposed of any installations thereon because it desired first to discuss the matter with plaintiff to ascertain if she might not have some use for them. Plaintiff replied that these parcels were zoned residential and the type of installations thereon, such as airplane hangars, would not be consistent with such zoning. . She further stated that while she had no use for the installations, she would consider a cash settlement in lieu of restoration but without any credit to be given for the installations. Defendant’s representatives urged plaintiff to reconsider the possibility of her being able to make some use of the installations, especially the airplane hangars in which the Government had a considerable investment. The possible interest of a certain private helicopter company in renting the hangars was also discussed. As a result, the matter was left open for further consideration by plaintiff and discussion between plaintiff and defendant’s officials.
As to parcels 4 and 5, defendant’s representatives stated that in view of plaintiff’s complaint that satisfactory restoration had not been made (finding 25), the Corps would be willing to return to the parcels and perform additional *527 restoration work if plaintiff would indicate what she desired to have done. However, plaintiff, without being specific about any detail of the restoration, simply took the position that she wanted the parcels restored in accordance with the terms of the leases.
Several times during the conference, plaintiff brought up the question of the first lease, but the representatives of the Corps stated each time that the YA had jurisdiction over that parcel and lease and that since the Corps had no authority over it no purpose would be served by discussing it. However, they offered to make an appointment for her to discuss the situation with the YA, since the YA officials had advised the Corps that they would like to discuss the restoration with plaintiff but had been unable to contact her. However, plaintiff said this was unnecessary. Plaintiff stated that in her opinion the transfer of the lease to the YA was ineffective because of the lease provision concerning nonassign-ability. In reply, the representatives of the Corps took the position that the transfer was one between two Government agencies and was not an assignment such as was prohibited by the terms of the lease. However, plaintiff at that time and thereafter continued to believe that the transfer could not be made in light of the provisions of the lease.
30. In furtherance of her consideration of the question of what use she might make of the buildings on parcels 2 and 3, as discussed at the meeting referred to in finding 29, plaintiff, on December 29,1947, by telephone, requested the Corps to send her such plans or drawings as were available which would enable her to determine the nature of the buildings on parcels 2 and 3. She stated that without such drawings she could not tell what the buildings might- be used for, and whether they would violate the zoning ordinances. By letter of December 30,1947, the Corps transmitted to plaintiff, in accordance with her request, “a complete set of construction plans of the hangars at Republic Flying Field, Farm-ingdale, New York, which consists of forty-two (42) drawings.” The letter requested that the drawings be returned to the Corps when they had served plaintiff’s purpose, but, despite requests by the Corps, plaintiff never returned them. These drawings were the construction plans of the installations “as built” on all five parcels.
*528 31. Under date of January 13, 1948, plaintiff sent to the VA invoices covering “rent due” under the first lease for parcel 1 for the term July 1, 1947 to December 31, 1947, in the amount of $655.50.
32. As a result of the meeting referred to in finding 29, and the dissatisfaction expressed thereat by plaintiff with the restoration performed by the Corps on parcels 4 and 5, the Corps reinspected these parcels and determined that the restoration work theretofore performed was in fact incomplete and that further restoration work should therefore be performed on these parcels. Accordingly, arrangements were made to complete such work and pending such completion, it was determined to withdraw the “Notices of Cancellation” of the fourth and fifth leases previously sent, as set forth in finding 22. By identical letters of February 13, 1948, with respect to such leases, the Corps notified plaintiff that such notices were “hereby withdrawn” and that the leases were “reinstated”.
33. In March 1948, plaintiff called the VA on the telephone to inquire about the rent invoices referred to in finding 31, but was advised that the invoices would not be paid because the lease had expired. By letter of March 15, 1948, the VA confirmed this advice to plaintiff, as follows:
This letter serves as a confirmation of our statement to you that the Veterans Administration has no further liability for the rental of these premises inasmuch as this lease expired by its terms on June 30,1947.
Defendant has paid no rent under the first lease for any period beyond June 30,1947.
34. After failing to hear from plaintiff coacerning any decision she had made with respect to parcels 2 and 3, and also after failing to contact her by telephone, the Corps, on March 24, 1948, sent the following registered letter to plaintiff:
The government is desirous, as previously indicated to you, of discussing the return to you ol your property at Farmingdale, N.Y., covered by the referenced leases. However, the government cannot restore the premises in the manner outlined by you informally, since to do so would in the opinion of this office involve an expenditure in excess of the value of the lands in *529 volved. If it is agreeable to yon, this office is ready to recommend that all of the government improvements erected on the leased land be transferred to your ownership, in lieu of restoration, and the execution by you of a release, relieving the government of any and all further obligations that there may be on the part of the government to be performed in connection with the referenced leases except the payment of rental to the date of termination.
In this connection, reference is made to telephone conversation, 29 December 1941, * * * at which time you requested a set of drawings showing the construction of the government improvements, consisting chiefly of two (2) hangars, erected on the land held under referenced leases. The aforementioned drawings were forwarded to you by letter from this office dated 30 December 1941 with the request that they be returned when you have obtained therefrom the information desired.
As indicated to you in the aforementioned telephone conversation, this office has been approached by the P. C. Helicopter Company of 25 West 43rd Street, New York City, who are desirous of leasing the hangars and adjacent land areas referred to above. This office has been advised by representatives of said P. C. Helicopter Company that they have been unable to arrange a meeting with you to discuss the possibility of renting the property in question.
This office has hesitated to enter into any negotiations with the Helicopter Company for the use of the property because of the belief that you are interested m obtaining a return of the property to your possession. Under the circumstances, however, it becomes impossible for the government to permit government-owned improvements of this character to lie idle while there is ■an actual demand for their use, particularly in view of the fact that the government is paying rental to you for the use of the land.
You are therefore advised that, unless this matter can be settled by 5 April 1948, and you agree to accept a transfer of the government’s improvements in lieu of restoration, this office will take such steps as are necessary to protect the interests of the government in the premises and will recommend that the hangars be leased for commercial purposes to either the P. C. Helicopter Company or to any other interested party or parties, pending the final determination of action to be taken.
*530 35. Oa March 25,1948, plaintiff sent a letter to the Corps concerning the first lease with which she enclosed a copy of the letter dated March 15, 1948, from the VA, referred to in finding 33. Plaintiff complained that the restoration provisions of the first lease had not been complied with, that “large, heavy concrete platforms and foundations remain; debris is scattered all about and everything of value has been removed.” She asked the Corps to “take the necessary action to restore the property to it’s [sic] original condition as soon as possible so that I may again have the use of it and forward rent payments which are, of course past due and payable.” By letter of March 31, 1948, the Corps replied that:
Confirming advice previously given to you, your attention is invited to the fact that on 1 January 1946 administrative jurisdiction over lease No. W 1098-eng-3355 was transferred by this office to the Veterans Administration which agency is charged with the responsibility of administering all parts of said lease on and after that date.
Your letter is therefore being referred to the Veterans Administration for such action as may be appropriate in the circumstances. This office cannot and has not attempted to judge the acts of another government agency.
36. Prior to April 5, 1948, plaintiff met with the representatives of the Helicopter Company mentioned in defendant’s registered letter of March 24, 1948 (finding 34) but was unable to come to any satisfactory agreement with them. On that date, plaintiff sent a letter to the Corps concerning the second and third leases which was in reply to said letter of March 24. Plaintiff stated she was only seeking restoration of these parcels in accordance with the terms of the leases; that defendant’s proposal to transfer the improvements to her “in lieu of restoration” was now impossible “as the plumbing fixtures, tanks, heating systems, blowers and motors, etc. have been removed from the premises”; that such removal was “not in accord with” the understanding she had with the Corps; that the meeting she had with the Helicopter Company was unproductive; that the proposal of the Corps to lease the premises to some commercial *531 company would violate the nonassignment provisions of the leases; and that plaintiff was “willing to cooperate” and to discuss the matter further. The letter further stated:
The leased parcels are located in the inner part of my property and are not for sale because this would disrupt my plans for the use of the entire property. The roads constructed by the Government cut my land into irregular shapes, thereby damaging my adjoining land. In addition this must also be considered, although the Government used the property for industrial purposes, I have no assurance that the authorities would permit me to use the property in a like manner and if I did take over the structures, etc. the authorities might compel me to remove them, in which event I would have the responsibility and financial burden of restoring my property which the Government under the terms of the leases has already agreed to do.
37. In furtherance of its decision to perform additional restoration work on parcels 4 and 5 (finding 32), the Corps, in April and May 1948, completed the restoration work as called for by the fourth and fifth leases. A work force employed by the Corps itself removed the remaining cesspools including the concrete therein, all remaining concrete slabs, debris, septic tanks, roads and roadway beds. All holes were filled, and the surface of the property restored with topsoil. The property had remained unused and unoccupied ever since the Army had vacated the premises in 1947, and some of the debris on the parcels had been placed there by others. However, the Corps hauled everything away. Nothing was buried on the site. Five trucks were used during this operation, and over 1,000 yards of topsoil were spread over both parcels. The topsoil was spread 6 to 8 inches deep on the former roadbed areas and 3 to 4 inches elsewhere. The disturbed areas were then reseeded. The restoration work extended over a period of approximately 30 days. After completion of the work, several close inspections were made, including an inspection with the original construction drawings, to make certain that the work was satisfactorily performed and all installations removed.
The soil on the five parcels, including parcels 4 and 5, is that of the Farmingdale area generally. As is predom *532 inantly true of the south shore Long Island area, it is not highly fertile or productive. For the most part, the topsoil on all the parcels consists of a so-called “Ap horizon”, which is a term given cultivated surface soil where the topsoil and subsoil have been mixed. This was also the situation on parcels 4 and 5 where the Ap horizon averaged 9 inches. The replenishment of the disturbed areas with from 3 to 8 inches of pure topsoil as was accomplished by defendant on these parcels was, accordingly, ample restoration. This also exceeded the general practice in the industry on demolition and restoration work in housing developments, which is to spread approximately 3 inches of topsoil in disturbed areas.
Plaintiff does not intend to farm these parcels or to develop the property as a residential area. She is planning to develop the area into an industrial site. Although the property is zoned residential, it can without difficulty be rezoned to industrial.
After the premises were completely restored by defendant, unknown third parties continued to use these parcels as a dumping area and for other purposes, making a path on the property. Over plaintiff’s protests, the Corps refused to assume any further responsibility for these parcels.
38. By identical letters dated May 17,1948, concerning the fourth and fifth leases, the Corps advised plaintiff that “the Government has completed restoration of” parcels 4 and 5. A “Notice of Cancellation” was enclosed with respect to each lease, effective July 19,1948. Each Notice stated:
Notice is hereby given that the United States of America exercises its rights reserved in said lease and will quit, relinquish, and give up said premises on the 19th day of July 1948.
39. On July 13, 1948, plaintiff sent a bill to the Corps for rent for parcel 1 for the 1-year period July 1, 1947 to June 30, 1948. By letter of August 13, 1948, the Corps referred to its letter of March 31, 1948 (finding 35) confirming “the fact that administrative jurisdiction over the * * * lease had been transferred by the Department of the Army to the Veterans Administration on 1 January 1946.” The letter stated that “the responsibility for deter *533 mining whether or not rental is due for the payment thereof, rests with” the YA and that the bill had been sent to the VA “for such action as may be appropriate in the circumstances.” It closed with the suggestion that any further correspondence in connection with parcel 1 be addressed to the YA.
40. By letter of October 29, 1948, concerning parcels 2 and 3, the Corps advised plaintiff that it had “restudied the entire situation surrounding this matter” and “as suggested in your letter of April 5, 1948” (finding 36) it was willing to discuss the matter further. By letter of November 8, 1948, plaintiff responded that she would “communicate with you very soon to arrange for a conference regarding the property covered by the above leases.”
41. By letter of November 15, 1948, concerning parcels 4 and 5, the Corps advised plaintiff that under its Notices of Cancellation with respect to the fourth and fifth leases (finding 38) rent was due up to July 19,1948; that rent had been paid through June 30, 1948; and that rent was therefore due plaintiff for the period July 1, 1948 to July 19, 1948. The letter enclosed two public vouchers for plaintiff to execute covering both leases. One was for the fourth lease in the amount of $20.73, and the other for the fifth lease in the amount of $40.55. Plaintiff has never executed these vouchers and submitted them to defendant. Defendant has paid no rent under the fourth and fifth leases for any period beyond June 30, 1948. Defendant has at all times, after its letters of May 17, 1948 (finding 38), admitted its liability to plaintiff in the amounts of $20.73 and $40.55, respectively, with respect to these leases for rentals up to July 19,1948.
42. On December 9,1948, representatives of the Corps met with plaintiff and plaintiff’s engineer in plaintiff’s offices in accordance with the previous exchange of correspondence concerning parcels 2 and 3 (finding 40). Plaintiff asked to see the engineering report and data which the Corps had had prepared setting forth defendant’s estimates of the cost of restoring the parcels to their original condition and the salvage value of the remaining installations. Defendant’s representatives felt that their restoration cost estimates should not be physically released to plaintiff in the absence *534 of the preparation by plaintiff’s engineer of similar data which could then be exchanged and compared. The customary procedure of the Corps in handling cases of this kind was for the lessor to accompany defendant’s engineer to the site, go over each item together, and attempt to agree on quantities and prices. Since plaintiff would not so proceed, the representatives of the Corps felt the only alternative would be for both sides to prepare estimates and then exchange and compare them. However, defendant’s representatives did advise plaintiff of the ultimate conclusions set forth in the report they had, which was to the effect that the cost of restoring parcels 2 and 3 would be approximately $60,000 after allowing for the salvage value of the buildings, the total restoration cost being estimated to be approximately $76,000 with the salvage value being approximately $16,000.
Since many items installed on these parcels had been removed or stolen and the property was no longer in the same condition as when it was occupied by the Army, plaintiff would not agree to accept a return of the property in its then existing condition in lieu of restoration. She demanded either a cash payment representing the cost of restoring the property, with no credit to be given for the installations left in place, or that the parcels be restored in strict accordance with the restoration provisions of the leases.
As to the actual restoration work to be accomplished, defendant’s representatives invited plaintiff and her engineer to accompany them to the site and attempt to agree upon the restoration work. However, plaintiff would not agree to meet with the representatives of the Corps on the site.
The representatives of the Corps stated they feared that complete restoration in strict compliance with the terms of the leases would not only represent economic waste in light of the great value of the installations in place and plaintiff’s contemplated use of the property as an industrial development, but would also result in an expenditure of funds which would exceed the value of the parcels themselves. One of the representatives of the Corps was a lawyer and expressed the opinion that the Government would in no event be obligated to expend a sum to restore the premises which would exceed their value, and suggested that, if plaintiff disagreed, she *535 should secure the services of an attorney to protect her interests in the matter and to indicate to the Corps wherein its legal position was unsound. He also suggested to plaintiff that, if plaintiff’s attorney agreed that defendant’s legal position was sound, plaintiff obtain an appraisal of the parcels which would thus fix the upper limits of defendant’s restoration obligation. Plaintiff replied she would consider obtaining, as suggested, an engineer’s estimate, an attorney, and a land appraisal. However, throughout the period of negotiation with respect to these two parcels, plaintiff never secured the services of an attorney to negotiate or consult with the Corps about the matter, nor did she ever submit to defendant an engineering report or a land appraisal. As a consequence, the Corps never submitted its engineering report to plaintiff. However, to further assist plaintiff in making a determination of what installations might be usable for her purposes, defendant’s representatives gave to plaintiff at the meeting five blueprint drawings which were in addition to the 42 previously given to her. These drawings showed what underground utilities had been installed on parcels 1, 2 and 3 and where they were located.
At this conference, parcels 4 and 5 were also discussed, with the representatives of the Corps taking the position that defendant had complied in all respects with the restoration provisions of the fourth and fifth leases. Plaintiff denied this and the representatives of the Corps invited plaintiff to accompany them to the parcels and indicate what further restoration work she wished to have accomplished. However, plaintiff refused and simply insisted that the parcels be restored in accordance with the strict terms of the leases.
Plaintiff also raised at the meeting the question of parcel 1 but defendant’s representatives reiterated that the Corps no longer had any jurisdiction over this parcel and therefore could not discuss it. They suggested that instead plaintiff discuss the problem of the first lease with the officials of the VA. However, plaintiff again voiced her belief that the transfer to VA was a violation of the provisions of the first lease.
Without such information as was set forth on the five drawings given to plaintiff at the meeting, it would not be *536 possible to estimate accurately the cost of restoring the premises to their original condition. However, there is no evidence that defendant at any time withheld or refused to give plaintiff any information or data which she requested and which would enable her or her engineer to ascertain the nature and extent of the Government’s installations so that plaintiff could make her own estimates of demolition and restoration costs. Whenever plaintiff requested any such data, such as the five drawings furnished at this meeting, or the 42 drawings referred to in finding 30, they were promptly furnished by the Corps.
43. By letter of December 28, 1948, the District Engineer of the Corps of Engineers, New York District, referred to the conference had by the representatives of the Corps with plaintiff in plaintiff’s office on December 9, 1948, and stated that: “A review of the case leads me to the conclusion that further correspondence may not be of much help in furthering negotiations.” He stated he was “anxious to complete the transactions, and to this end would very much appreciate it if you could arrange to come to my office at an early date with a view towards reaching a settlement.” He suggested that “it would be wise for you to have with you at that time such engineering and legal advisers as you may care to bring”, and expressed the hope that the meeting could be held “soon after the first of the year.” Plaintiff ignored the suggestions set forth in this letter. Instead, she sent to the Corps rent invoices covering all five parcels. By letter of February 2, 1949, concerning parcel 1, the Corps again informed plaintiff of the YA’s jurisdiction over the parcel, that it was forwarding the invoice to the YA, that the Corps “has no authority over subject lease” and that plaintiff “should address all future inquiries” about the lease to the YA. By letters of February 3, 1949, concerning parcels 2 and 3, the Corps advised that the second and third leases “expired by limitation on 30 June 1948,” which was the date to which previous renewals of these leases had extended them. The rent bills on these leases were therefore returned to plaintiff. By an additional letter of February 3, 1949, concerning parcels 4 and 5, the Corps reminded plaintiff of the Notices of Cancellation extending the term to July 19, 1948, and stated that bills for rent on such parcels would be hon *537 ored up to sucli date. However, by letter of April 13,1949, to the Corps, concerning all five leases, plaintiff again submitted invoices for rent on all the parcels and stated:
Kindly inform me when you intend to restore my property in accordance with the above lease contracts as an examination discloses that no attempts have been made to remove the dilapidated structures, concrete platforms, foundations, open wells, roads, debris, etc.
If you have not done so it is suggested that you carefully read the lease contracts and acquaint yourself with the clauses. You will find that any cancellations are invalid until restoration has been completed.
Notices of cancellation sent to me show an utter ignorance or disregard of the terms of the lease contracts and it is perfectly absurd for any Department of the United States Government to suggest that I accept my property in it’s [sic] present deplorable condition. As I wrote you in my letter of April 5,1948,1 ask for nothing more, nor do I expect more, than is stated in the leases signed by the Government and myself, these terms I expect the Government to honor.
The enclosed bills are past due and payments are due until such time as you have restored the property in accordance with the clear and specific provisions of the lease contracts.
You will oblige me by giving this matter your immediate attention.
By letter of April 22, 1949, the District Engineer acknowledged receipt of plaintiff’s letter and rent invoices, enclosed a copy of his letter of December 28, 1948, suggesting a conference, and stated:
I will appreciate your comments with respect to my December letter. The suggestion therein that a meeting be held in this office with a view to reaching a settlement still appears to be the only hope of concluding this matter.
Plaintiff did not respond to this letter nor adopt the suggestion contained therein.
44. The Corps finally concluded that no agreement with plaintiff concerning the installations on parcels 2 and 3 could be reached. It therefore decided to sell the buildings thereon. In addition to resulting in some salvage value of the installations to the Government, it would result in returning the parcels to plaintiff in a safer condition, even *538 if it were decided not to effect complete restoration. Accordingly, by an “Invitation for Bids” dated July 15, 1949, the Corps invited sealed bids to be submitted on August 15, 1949, for the sale and removal of the buildings on the two parcels, described in finding 14, two fire hydrants, and the electrical distribution system, consisting of poles, wire and transformers. On July 20, 1949, the District Engineer sent identical letters to plaintiff concerning the second and third leases, as follows:
Reference is made to numerous attempts by representatives of this office to negotiate with you a settlement of the Government’s restoration obligation under the referenced leases and particularly to my letters of 28 December 1948 and 22 April 1949, suggesting that you meet in my office with a view to reaching a settlement and concluding this matter.
In view of the inability to arrive at any understanding or a firm statement from you, it has been decided to sell the Government erected buildings now on your lands covered by the referenced leases and permit the successful bidder to remove the buildings from the site. For your information there is inclosed herewith Invitation for Bids and Bid Form.
Inasmuch as the buildings will be removed from the site, the construction drawings loaned to you by this office will probably be of no further value to you and it is therefore requested that you return them to this office.
45. On August 9, 1949, plaintiff sent the following letter to the District Engineer with respect to the second and third leases:
Acknowledgment is made of your letters of April 22 and July 20, 1949 the latter enclosing “Invitation for Bids” and “Bid Form”.
You say you have all the files pertaining to this matter in your office. If so, my letters and your memo-randa of meetings I had with various representatives of the Government (of which I have complete records) will show I have cooperated fully with your department in order to settle this matter.
In your letter of July 20, 1949 you state that in view of the inability to get a firm statement from me it has been decided to sell the Government erected buildings now on my lands covered by the referenced leases.
*539 Four years ago, in October 1945, I stated very definitely that it would be agreeable to me to follow the usual procedure of the Government in similar matters of this kind as explained to me * * * and confirmed in correspondence * * *. This is the way the settlement of these leases was to have been made and such an arrangement would be satisfactory to me at the present time.
The above lease contracts cover approximately 15.6+ Acres of my property leased by the United States of America for “Military Purposes” and “Barracks”. At the present time the property is covered with two large frame hangars, numerous other dilapidated frame buildings; over 25 percent of the 15.6+Acres is covered with thick massive concrete platforms, asphaltic macadam roadways running askew and in odd locations; septic tanks, cesspools, hydrants, buried water pipes, drainage pipes, electric power poles, broken fences, wires, etc. These “improvements” are in an area zoned for “Residential” use. The Government’s Engineers and Appraisers estimated that the cost of removing these concrete platforms, foundations, etc. and restoring my property to it’s [sic] original condition as provided under the terms of the lease contracts would be approximately $150,000.
The improvements as they stood at the time the Government ceased active use of the property, cannot be offered to me now, because everything of value and movable has disappeared including mechanical installations, heating systems, blower fans, electric motors, heaters, plumbing fixtures, etc.
If the Government is to go forward with the restoration of my land in lieu of the settlement with me as mentioned above, I note that the Specifications incorporated in the “Invitation for Bids” fail to provide for the removal of the large areas of massive concrete platforms, concrete foundations, buried water pipes, roadways, etc. and make no provision for replacing top soil in the areas disturbed, etc. necessary for the complete restoration of my property to its original condition which is one of the terms the United States of America is bound to honor under the lease contracts.
You will agree that I have been very patient and cooperative. The War has been over four years and the Government has ceased actual use of my property but I have been deprived of the use of it and the income I would have received from it if I could have used it in the manner I have planned. Although the Government is under obligations to pay me rental until my *540 property is restored to its original condition, my bills, when forwarded to your office have been returned — ■ unpaid.
I am quite sure that if the entire matter is carefully reviewed and given proper consideration a just settlement may be effected.
The reference to $150,000 in the letter was based on a misunderstanding. The figure is erroneous. The figures mentioned at the conference referred to were as set forth in finding 42.
46. By letter of August 29,1949, concerning all five leases, plaintiff sent to the Corps rent bills covering the five parcels. The letter stated:
Enclosed herewith are bills in quadruplicate for rent due on the above lease contracts.
Also enclosed are photographs showing the present condition of the leased premises.
Clause of lease Contracts provides that “Kent payments to continue until such time that the property has been restored to it’s [sic] original condition.”
The enclosed photographs show conclusively that the property has not been restored.
It is requested that payment be made without further delay.
The photographs enclosed with the letter were of all five parcels.
47. Pursuant to the Invitation for Bids described in finding 44, the installations described therein and offered for sale were sold and their removal from parcels 2 and 3 by the successful bidder was completed on or about September 30,1949. This sale and removal involved only the superstructures on the parcels. All of the concrete aprons, floors, foundations, paths, roads, underground water supply lines, cesspools, septic tanks, sewers and drains, and seepage basins still remained on the property.
48. On February 8, 1950, the Corps sent a letter to plaintiff with respect to the second and third leases advising that defendant had “effected a removal of the Government installed additions situate upon the premises covered by the referenced leases with the exception of pavements, concrete floors, foundations, walks and roads.” The letter further stated:
*541 The lands covered by referenced leases are, therefore, hereby returned to you for your use and the Government will hereafter assume no responsibility in connection therewith. In this connection your attention is invited to the fact that each of the referenced leases terminated on 30 June 1948 since no action was taken as provided in paragraph 5 of each lease for renewal.
The letter went on to state that, as previously explained to plaintiff, the Corps:
* * * cannot expend for the restoration of your properties or pay you in lieu thereof any sum greater than the amount by which the market value of the premises has been diminished by the failure to effect a complete and full “restoration” to the condition existing at the time the Government took occupancy of the property. The law of damages, as repeatedly expressed by the courts, establishes the diminution in value of the property as the ceiling on any cost of restoration or repair of damage. It is the opinion of this office that the removal of the concrete and other Government additions now remaining on your property and a return of the property to the state in which it previously existed, far exceeds the value of the land itself.
Should you even consider, therefore, that the premises held under referenced leases have been diminished in value 100%, the Government’s legal obligation would be limited to a payment to you, in lieu of restoration, to the full extent of the fair value of the fee of the premises. Likewise the performance of physical restoration would be limited to an amount not greater than the fee value, which is impractical at this time since it is not possible to do only a part of the work effectively. It is further felt that the accomplishment of partial “restoration” would benefit no one and would constitute economic waste.
The letter stated that the Corps still desired to make a cash settlement “in lieu of further restoration within the frame work of the legal principles set forth above” and was willing to discuss the question with plaintiff “in order to arrive at the dollar obligation of the Government.” Enclosed with the letter were public vouchers covering the period July 1,1948 to February 9,1950, for each lease, “for which period the Government recognizes that under the leases it is responsible for the payment of rental.” The vouchers for the second and third leases were in the amounts of $724.55 and *542 $603.79, respectively. The bills on. these leases which plaintiff had theretofore submitted for rental by her letter of August 29, 1949 (finding 46) were returned “since they cover a period subsequent to the expiration of the leases which period can be handled only in its entirety, through the day on which the property has hereby been returned to you.”
Defendant has paid no rent under the second and third leases for any period beyond June 30, 1948. Defendant has at all times after February 8, 1950, admitted its liability to plaintiff in the amounts of $724.55 and $603.79, respectively, with respect to these leases for rentals up to February 9, 1950, in accordance with the vouchers enclosed with its February 8, 1950 letter. These vouchers described the rent indebtedness as being for “use and occupancy” of the parcels “in accordance with provisions” of the leases “whereby payments in the nature of rent continue until restoration is completed.”
49. On February 27,1950, the Corps sent a letter to plaintiff with respect to the fifth lease returning the rent bill in the amount of $793.88 which plaintiff had sent with her letter of August 29, 1949 (finding 46) with the explanation that the lease had been terminated “effective 19 July 1948” and that payment could not be made for any period beyond such date. Another voucher in the sum of $40.55 covering the period July 1, 1948 to July 19, 1948 was forwarded for plaintiff’s execution “which rent this office acknowledges is due and owing to you * * *.” On February 28, 1950, an identical letter was sent to plaintiff with respect to the fourth lease. In this instance, the voucher forwarded was in the amount of $20.73.
50. On July 10, 1950, plaintiff sent a letter to the Corps with respect to all five leases, with which she enclosed bills for rent due on the five parcels. The letter stated: “In accordance with the provisions of these lease contracts, payments of rent are to continue until restoration is completed. Kindly forward payment.” In reply, the Corps, by letter of August 7, 1950, advised plaintiff that its letter of February 8, 1950 (finding 48) set forth its position concerning parcels 2 and 3, and its letters of February 27 and 28 (finding 49) its position on parcels 4 and 5, and that its views regarding *543 these four leases “remain unchanged”; that rent would be paid “to the extent an obligation therefor has heretofore been recognized”; and that the Corps was still willing to discuss “a cash settlement in lieu of further restoration” of parcels 2 and 3 “within the framework of the legal principles set forth in the letter of 8 February 1950.” As to the first lease, the letter went on to state that “as you were advised by letter of this office dated 28 February 1950, and in earlier correspondence and discussions, this lease has not been administered by the Department of the Army since 1 January 1946, at which time administrative jurisdiction thereof was transferred to” the VA. The rent bills submitted by plaintiff with her letter were, “in view of the foregoing”, all returned to plaintiff “without action.”
51. Despite the Corps’ letter of August 7, 1950 (finding 50) and the previous correspondence from the Corps setting forth the position of the Corps with respect to all five leases, plaintiff persisted in submitting rent bills to the Corps periodically on all five leases. By letter of July 28,1952, the Corps returned such bills to plaintiff with a letter similar to its said letter of August 7,1950.
52. Under date of April 13, 1953, plaintiff sent a letter with respect to all five leases to the Secretary of Defense, in which she enclosed, among other things, rent bills covering the five parcels, as well as 20 photographs allegedly showing the then condition of the property. The letter stated:
The enclosed bills for rent due on the above contracts are sent to you directly because the United States Army — Corps of Engineers, New York District refuses to honor the above written agreements of the United States of America.
The fact that payments in the nature of rent are to continue until restoration is completed is corroborated by the Dept, of the Army on it’s [sic] “Public Voucher”, a photo copy of which is enclosed.
The “Restoration Clause” in the above contracts, a copy of which is also enclosed, specifically sets forth what the Government has agreed to do.
The condition of the property as shown in the enclosed twenty photographs is definite proof that the property presently leased to the United States of America under the above contracts has not been restored.
Your attention to this matter will be appreciated.
*544 Acknowledgment was made by letter of April 24,1958, which gave assurances that the matter would be “looked into” and that plaintiff would be further advised. By letter of June 17, 1953, plaintiff was so further advised, as follows:
* * * * *
Inasmuch as it appears that an attempt on the part of the Office of the District Engineer, Corps of Engineers, New York, New York, to reach a settlement in this matter has apparently failed and no solution can be found nor any settlement made within prescribed legal limitations, it is therefore suggested, if you so desire, that you file a claim for any damages which you may deem due you by reason of the Government’s occupancy of your property with the District Engineer, Corps of Engineers, 80 Lafayette Street, New York 13, New York. The claim will then be submitted to the General Accounting Office for consideration and such action as that agency may deem appropriate.
Please feel free to call upon the District Engineer for any assistance you may need in filing your claim.
With regard to Lease No. W-1098-Eng-3355, it is suggested that you communicate with the Veterans Administration, Washington, D.C., inasmuch as this lease was transferred to that agency effective 1 January 1946 and all the terms and conditions thereof, including restoration, were assumed by that agency.
On June 30, 1954, plaintiff’s petition herein was filed.
53. (a) After the filing of the petition, the local town government acquired for school purposes 15 acres of parcel 1 by condemnation. Accordingly, 43.8 acres remained in parcel 1 after the condemnation. Plaintiff received payment for the 15 acres in 1955. The local authorities, in erecting the school, removed the government-built installations on these 15 acres, including the concrete slabs and foundations on such portion of the parcel.
(b) In the fall of 1958, the town of Babylon caused the superstructure of the former Army chapel building on parcel 1, referred to in finding 24, to be demolished, considering it unsafe. The costs of such demolition to the town have been charged to plaintiff and presently exist as a lien against her property.
54. Separate and apart from defendant’s statute of limitations defense applicable to parcel 1, there is no dispute *545 between the parties that defendant breached its restoration obligations on the first, second, and third leases. However, the parties are in disagreement as to the date or dates of the breach or breaches by defendant of the restoration covenants of these leases. The demolition and restoration costs for parcels 1, 2, and 3 for the years 1947-1954 would, exclusive of any restoration or damage allowances for trees removed from the properties, be as follows (parcel 1 being calculated both on the original 58.8-acre basis, and on the 43.8-acre basis, the acreage remaining after the aforementioned condemnation of 15 acres of said parcel by the local authorities) :
Parcel 1* (58.8 acres) Parcel 1 (43.8 acres) Parcel 2 (8.89 acres) Parcel 3 (6.707 acres)
1954-116, 046 73, 447 25, 449 65, 447
1953. 110, 848 70, 157 24, 309 62, 516
1952. 105, 190 66, 576 23, 069 59, 325
1951. 100, 298 63, 480 21, 996 56, 566
1950. 89, 595 56, 706 19, 649 50, 530
1949. 88, 143 55, 787 19, 330 49, 710
1948. 85, 085 53, 851 18, 659 47, 986
1947. 76, 447 48, 384 16, 756 43, 114
This restoration work contemplates the removal of all remaining Government-built installations, including all superstructures, such as buildings and chimneys, all surface *546 installations, such as concrete aprons, floors, foundations, footings, cinder paths, and gravel and asphaltic macadam roads, and all subsurface installations, such as footings, cesspools, septic tanks, leaching pools, sewers and drains, seepage basins, grease traps, catch basins, and water supply lines. It further contemplates the hauling of all the installations and debris to a dump so that nothing would remain buried on the premises, and the spreading, in all disturbed areas, of a good grade of loam up to within 3 inches of grade, with 3 inches of topsoil then spread to grade. Finally, all disturbed areas would be reseeded.
As stated, since plaintiff plans to develop her 300 acres, of which these parcels are a part, into an industrial center, some of the type of restoration herein described, such as the spreading of topsoil and the reseeding, may well constitute waste, since the surface would merely be torn up again after such restoration, if the same portions of the parcels are involved. However, there is no evidence as to when plaintiff intends to go forward with her plans. She has not thus far proceeded because she feels the existence of the installations on the leased parcels interfere with such development and must first be removed, especially the approximately 4 acres of concrete on parcels 2 and 3. She has, accordingly, determined to await the outcome of this suit, and some time thereafter must necessarily elapse to formulate plans, assuming that she will at that time still adhere to her original intention. If the property is not actually restored prior to the commencement of its development as an industrial center, the full restoration amounts set forth herein will not need to be spent in their entirety, for the construction contractor developing the center could mesh the demolition operations into his construction operations, and the topsoil and reseeding operations would not be undertaken to the extent represented by such figures. For instance, excavation work to remove a cesspool would not be filled up, but would instead become part of the new foundation. Under all of the circumstances, therefore, and especially in light of the total nonuse of the five parcels which, under plaintiff’s ownership, have lain idle, and of plaintiff’s intention to devote them to industrial and commercial uses, as described, the amounts set *547 forth in this finding for demolition and restoration are ample.
The demolition and restoration work herein involved is not unusually difficult of accomplishment nor does it represent a unique situation. Similar types of work are being constantly accomplished successfully in the industry. Competent and well-equipped contractors specializing in this type of activity are located in the Long Island area. The Corps itself, with its own work forces, does a large amount of work of this nature.
55. As set forth in finding 13, during its occupancy of parcel 1 defendant removed therefrom, without plaintiff’s permission, 20 native trees, such as oaks and maples, which were 9 to 26 inches in diameter. The restoration costs set forth in finding 54 do not include any amount representing the value of such trees or what the cost would be to purchase and plant on the property trees of equal size.
At all times herein involved, it would have cost an average of approximately $1,000 per tree to purchase and have installed trees of similar variety and size as the 20 removed by defendant. If the measure of damages for breach of the provisions of the first lease concerning the trees and the restoration obligations is based on actual purchase and planting of similar trees, insofar as this would be possible culturally, $20,000 should be added to the figures in both parcel 1 columns in finding 54. However, native woodland trees in the Long Island area such as are here involved had an actual maximum average value during the pertinent years of approximately $100 apiece when located on residential property. This was the maximum amount paid by the Department of Public Works of the State of New York to compensate for such trees destroyed in connection with projects such as road widening. If the measure of damages is based on such value of the trees, $2,000 should be added to the figures in the parcel 1 columns.
If this land were to be sold to a developer or otherwise developed, the trees would have no value separate from the value of the property, nor would they add to such value. Such native growth is normally removed anyway in connection with the construction operations incident to the de *548 velopment. Tbeir removal by the Army would tlius save the developers the expense thereof. Therefore under all the circumstances we find that $500 per tree represents adequate compensation for the removal of the trees.
56. (a) The five parcels have been at all times, and still are, zoned for residential purposes, as is the balance of plaintiff’s 800 acres. However, as stated in finding 37, there would be no difficulty in having the property rezoned for commercial or industrial uses and, as stated, plaintiff has for some time planned to develop the area into an industrial center. By reason of the considerations set forth in finding 4, the most valuable and profitable use to which this property could be put would be industrial in the interior portions and commercial developments along the two main highways, such as gasoline stations, motels and restaurants. The entire 300-acre tract is generally considered one of the most desirable land areas left in such a large quantity in Long Island for industrial use. The use of the parcels for residential purposes would be adversely affected by the circumstance of their proximity to the landing strips on the contiguous property owned by the Republic Aviation Corporation. The airplanes using these landing strips include jet-propelled craft. As a direct consequence of this situation, the school building now located on the above-mentioned 15 acres, which are located in the northwest corner of the original parcel 1, required the installation of double thermo-pane glass windows (which may not be opened), air conditioning, and soundproofing, in order to eliminate or diminish jet and other noises emanating from the Republic flying field.
Although zoned as residential, parcel 1 is listed as industrial property for purposes of assessing local taxes. The ease of having the five parcels actually rezoned for industrial purposes arises by virtue of the circumstance that under the local zoning regulations, such rezoning procedures require the approval of only 51 percent of the adjoining property holders and plaintiff owns more than such 51 percent in the case of each parcel. A 5-acre parcel of land *549 which juts into one of plaintiff’s parcels herein involved was sold in 1955 when it was zoned residential, as is plaintiff’s property, but thereafter was rezoned for industrial uses.
The fair market value of the five parcels for the above-mentioned industrial and commercial purposes was, in their original condition, as follows for the following years:

Market value

Year per acre

1948 _$9,000
1950 _10,000
1952 _12,000
1953 _12, 500
1954 _12, 500
The value of parcels 1, 2 and 3 has been diminished by approximately the same amount as the cost of restoring them to their original condition. However, as stated in finding 54, if the property were to be developed as an industrial and commercial center, it would not, of.course, be necessary to restore it completely to its original condition to the extent of replacing the disturbed areas with topsoil or replacing any trees, but such installations as the concrete foundations and aprons, which would provide the bulk of the demolition and restoration expense, would have to be removed. The possibility of finding an industrial purchaser who could use the concrete foundations on parcels 2 and 3 is remote.
(b) As stated, the property is and always has been actually zoned for residential purposes, as plaintiff herself sometimes pointed out during the course of negotiations with the Corps in support of her demand that the Government remove the installations and comply strictly with the restoration provisions of the leases (findings 29, 30, 36, 45). If no consideration is given to the possibility and probability that the property will be zoned for industrial purposes at some time in the future, the fair market value of the property for residential development was, in its original condition, as follows for the following years:

Market value

Year per acre

1947 _$1, 500
1950 _ 3,000
1952 _ 4,. 000
*550 CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and it is therefore adjudged and ordered that plaintiff recover of and from the defendant the sum of one hundred seventy-four thousand five hundred seventy-five dollars and seventy-four cents ($174,575.74).

 Finding 54 includes costs for restoring parcel 1 as it existed at the time the lease was entered into (58.8 acres) and as it now exists following the acquisition of a portion of the tract by the Town of Babylon for a school site in 1955 (43.8 acres).

 The figures in this column are not in evidence. They have been derived as follows:
The figures adopted for the 43.8 acres of parcel 1, and for parcels 2 and 3, are those contained in defendant’s exhibits 14, 15, and 16. Defendant made no computation for parcel 1 on the original 58.8 acres since the school authorities had altered the 15 acres before defendant’s experts had an opportunity to inspect the parcel to calculate the restoration costs for the purpose of this action. However, it would have been possible to have made a reasonable calculation of the restoration costs of the original acreage by using the various construction plans and drawings as to what was built, ascertaining what the defendant had thereafter removed, and then calculating the demolition and restoration costs of the remainder. Plaintiff adopted this procedure, and calculated the demolition and restoration costs of parcel 1 on both bases. Plaintiff’s estimates of costs for the 58.8 acres and the 43.8 acres are shown by plaintiff’s exhibits 141 and 146, respectively. A comparison of the costs on the two exhibits shows that plaintiff’s ratio of costs for the 58.8 acres is 158 percent of its costs for the 43.8 acres. Applying this reasonably accurate ratio to the restoration costs set forth in defendant’s exhibit 14, being the restoration costs found applicable to the 43.8 acres, produces the figures in this column as being applicable to the 58.8 acres.